PHILADELPHIA COUNCIL OF NEIGH-BORHOOD ORGANIZATIONS, Poplar Stop the Tunnel Committee, Coalition for Better Transportation in the City, Philadelphia—People United to Save Humanity (P.U.S.H.), Disabled in Action of Pennsylvania, Inc., Resurrection, Friends of the Earth of Delaware Valley, Consumers Education and Protective Association, United Northeast Civic Association, Northeast Transportation Action Coalition, National Association for the Advancement of Colored People, North Philadelphia Branch, Frances A. Markovitz and Juanita H. Wooten, on their own behalf and on behalf of all others similarly situated, Plaintiffs,

v.

William T. COLEMAN, Jr., Secretary of Transportation of the United States, Robert E. Patricelli, Urban Mass Transportation Administrator of the United States, William T. Sherlock, Secretary of Transportation of the Commonwealth of Pennsylvania, The City of Philadelphia and Frank L. Rizzo, Mayor of the City of Philadelphia, Defendants.

Civ. A. No. 77–180.

United States District Court,
E. D. Pennsylvania.

Sept. 12, 1977.

Michael Churchill, Public Interest Law Center of Philadelphia, Harold E. Kohn, Philadelphia, Pa., for plaintiffs.

David W. Marston, U. S. Atty., Robert N. DeLuca, Asst. U. S. Atty., Philadelphia, Pa., for Federal defendants.

Herbert G. Zahn, Asst. Atty. Gen., Philadelphia, Pa., for Commonwealth defendants.

Louis J. Goffman, Bernard Chanin, Wolf, Block, Schorr and Solis-Cohen, Philadelphia, Pa., for City of Philadelphia and Frank L. Rizzo.

### OPINION

RAYMOND J. BRODERICK, District Judge.

### I. *Introduction*

Plaintiffs, a group of civic and community organizations and individuals, have brought this action[1] for declaratory and injunctive relief to prohibit the United States Secretary of Transportation (Secretary), the Administrator of the Urban Mass Transportation Administration (UMTA Administrator),[2] the Secretary of the Pennsylvania Department of Transportation, and the City of Philadelphia and its Mayor, Frank L. Rizzo, from funding, constructing, or proceeding in any activities to facilitate the building in Philadelphia, Pennsylvania of a project entitled "Center City Commuter Rail Connection" (CCCRC or Tunnel).[3] The project challenged by plaintiffs involves a four-track, 1.7 mile commuter rail Tunnel connecting the existing Penn Central Suburban Station at 16th Street and John F. Kennedy Boulevard with a new underground station to be constructed between 10th, 12th, Market, and Filbert Streets. The Tunnel will join the existing

---

1. Plaintiffs have designated this suit as a class action but have not filed a motion for class certification.

2. Although the complaint named William T. Coleman, Jr. as Secretary of Transportation and Robert E. Patricelli as UMTA Director, their successors in office, Brock Adams and Charles E. Bingham, have been substituted.

3. UMTA project No. PA–03–0013.

tracks of the former Reading Railroad system with the tracks of the former Penn Central system, thus connecting the two independent regional commuter railroad systems into one interrelated commuter rail system. A substantial portion of the Tunnel will be financed by a capital assistance grant from the Federal Government. A contract between the City of Philadelphia and the United States which estimated the cost to be $300,000,000 was signed on January 12, 1977. Under the contract, the Federal Government has agreed to pay $240,000,000 plus 80% of certain additional costs defined in the contract as extraordinary costs.

Jurisdiction for this action has been predicated on 28 U.S.C. §§ 1331, 1361, 1337, 1343(4); 42 U.S.C. § 1857h–2(a)(1); 33 U.S.C. § 1365(a)(1) and the principles of pendent jurisdiction. In their 61 page complaint the plaintiffs allege that the defendants' decision to construct the Tunnel violates a number of Federal and State statutory and constitutional provisions.[4]

The City and the Federal defendants filed a joint motion to dismiss or for summary judgment.[5, 6] The plaintiffs have filed a cross-motion for summary judgment.

II. *Scope Of Court's Review Of Administrative Decision Re Tunnel*

■ The initial inquiry, which must precede an examination of the administrative

decision to build the Tunnel, must focus on the scope of this Court's review. One thing certain, it is not the function of this Court to substitute its judgment as to whether the Tunnel should or should not be built. Whether the determination to build the Tunnel was a wise decision, or even a desirable one, is not for the Court to decide. The district court does not sit as a super-agency empowered to substitute its judgment for that of the agency. Evidence-weighing must be left to the agency making the policy decision. *County of Suffolk v. Secretary of the Interior*, 562 F.2d 1368, Civ. Nos. 77–6049, 77–6050 (2d Cir., Filed August 25, 1977). As stated by Judge Skelly Wright in *Ethyl Corp. v. Environmental Protection Agency*, 176 U.S.App.D.C. 373, 408, 541 F.2d 1, 36, *cert. denied*, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976), "It is settled that we must affirm decisions with which we disagree . . . ." It is our obligation, however, to give thorough consideration to each and every one of plaintiffs' allegations in making the review mandated by § 706(2)(A) of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), which provides that the reviewing court shall:

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . .

---

**4.** Plaintiffs allege that the following were violated: the Urban Mass Transportation Act of 1964, as amended, 49 U.S.C. § 1601, *et seq.*; the Department of Transportation Act of 1966, as amended, 49 U.S.C. § 1651, *et seq.*; the Department of Transportation and Related Agencies Appropriation Act of 1975, Pub.L. 93–391, 88 Stat. 789 (August 28, 1974); the National Environmental Policy Act of 1969, 42 U.S.C. § 4321, *et seq.*; the Clean Air Act of 1970, as amended, 42 U.S.C. § 1857, *et seq.*; the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1251, *et seq.*; the National Historic Preservation Act, 16 U.S.C. § 470, *et seq.*; Executive Order 11593; the Rehabilitation Act of 1973, 29 U.S.C. § 794, Title VI of the Civil Rights Act of 1964; 42 U.S.C. § 2000d; the Civil Rights Act of 1871, 42 U.S.C. § 1981; 49 C.F.R. § 21.1, *et seq.*; the Fifth and Fourteenth Amendments to the United States Constitution; the Pennsylvania Department of Transportation Act of 1970, 71 P.S.

§ 512, *et seq.*; the Philadelphia Home Rule Charter, 351 Pa.Code § 1.1–100 *et seq.*; and 53 P.S. § 17031. The latter three enactments are pleaded as pendent to the Federal claims.

**5.** Inasmuch as matters outside the pleadings have been considered, we shall consider defendants' motion as a motion for summary judgment.

**6.** The Secretary of the Pennsylvania Department of Transportation filed a separate motion to dismiss. No opposition having been filed to this motion and the parties stating at oral argument that no opposition would be filed, the Court has granted the motion. Therefore, when referring hereinafter to "defendants" it is understood that the Court is referring only to the City and Federal defendants.

The parties agree that this is the standard to be used by the Court in reviewing the administrative decision. The parties are in total disagreement, however, as to whether the Court is limited to examining the administrative record, as urged by defendants, or whether material outside the administrative record should be considered, as argued by plaintiffs. Surprisingly, both sides rely on *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), and *Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) in support of their divergent contentions.

In *Overton Park,* the Court held that the proper standard for review of informal agency action is whether the action of the agency is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" as provided in § 706(2)(A) of the APA. In delineating this standard for review, the Supreme Court stated, 401 U.S. at 416–417, 91 S.Ct. at 823–824:

> To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

The Supreme Court rejected the substantial evidence standard by pointing out that § 706(2)(E) of the APA is applicable only with respect to agency action taken pursuant to rulemaking authority or when the agency action is based on a public adjudicatory hearing. The Supreme Court also rejected the *de novo* review standard, concluding that such review is authorized by § 706(2)(F) only in two circumstances: where the agency action is adjudicatory in nature and the agency's fact-finding procedures are inadequate or where issues that were not before the agency are raised in a proceeding to enforce nonadjudicatory

agency action. *Overton Park* held that neither situation was presented by the administrative action under review, and concluded that the agency decision was subject to review only under the provisions of §§ 706(2)(A), (B), (C) and (D) of the APA, which confine a court to determining whether the agency acted within the scope of its authority; whether the decision made was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; and finally whether the agency conformed to the necessary procedural requirements.

As in *Overton Park,* the instant case involves neither agency action taken pursuant to rulemaking authority, nor is it based upon an adjudicatory hearing. Here, the agency action was not adjudicatory in nature and the plaintiffs are not seeking enforcement. In fact, the agency's decision to approve the grant is virtually identical to the agency action which the Supreme Court examined in *Overton Park.*

In *Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973), the Supreme Court reaffirmed the use of the arbitrary, capricious or abuse of discretion standard. Judge Skelly Wright interpreting *Overton Park* and *Camp* in *Ethyl Corp. v. Environmental Protection Agency, supra,* 541 F.2d at 34, said:

> [The arbitrary and capricious] standard of review is a highly deferential one. It presumes agency action to be valid. . . . Moreover, it forbids the court's substituting its judgment for that of the agency, and requires affirmance if a rational basis exists for the agency's decision.
>
> This is not to say, however, that we must rubber-stamp the agency decision as correct. To do so would render the appellate process a superfluous (although time-consuming) ritual. Rather, the reviewing court must assure itself that the agency decision was "based on a consideration of the relevant factors." Moreover, it must engage in a "substantial inquiry" into the facts, one that is "searching and careful." (citations and footnotes omitted).

■ Plaintiffs contend that the Court should not confine itself to the administrative record in making its determination as to whether the administrative decision to finance the building of the Tunnel was arbitrary, capricious, or an abuse of discretion. It is the plaintiffs' position that they should be permitted to introduce evidence outside the administrative record in order to show that the Department of Transportation's decision to finance the Tunnel was arbitrary, capricious, or an abuse of discretion. It is our opinion that the APA and the case law require this Court in this case to confine its review to the administrative record.

In *Overton Park*, citizens' groups contended that the Secretary of Transportation's approval of a highway to be built through a park violated § 4(F) of the Department of Transportation (DOT) Act of 1966, 49 U.S.C. § 1653(f), which prohibits the Secretary from authorizing the use of Federal funds to finance the construction of highways and other projects through public parks or historic buildings if a feasible and prudent alternative route exists. If no feasible alternative exists, the Secretary can approve construction only after all possible planning to minimize harm to the park or historic building. The Secretary approved the construction of the highway through the park without making findings concerning feasible alternatives. After discussing the standard of review, the Supreme Court said "[t]hat review is to be based on the full administrative record that was before the Secretary at the time he made his decision." [7] (footnote omitted). However, since the Secretary had not made formal findings, the Supreme Court concluded that "[i]f the District Court decides that additional explanation is necessary, that court should consider which method will prove the most expeditious so that full review may be had as soon as possible." [8] The Supreme Court's suggestion that the district court's review be confined, if possible,

to the administrative record appears to have become a mandate in *Camp, supra*, wherein an action was brought to compel the Comptroller of the Currency to grant a charter for a national bank. The district court granted summary judgment for the defendants on the basis of the administrative record. On appeal, the Fourth Circuit held that the basis of the Comptroller's ruling was not stated with sufficient clarity to permit judicial review, and remanded the case for a trial *de novo* before the district court at which time plaintiffs were to be afforded an opportunity to support their application through the introduction of relevant evidence.[9] In a per curiam opinion citing *Overton Park* the Supreme Court reversed the Fourth Circuit's approach, which "seems to put aside the extensive administrative record already made and presented to the reviewing court", 411 U.S. at 142, 93 S.Ct. at 1244, and held:

> In applying [the arbitrary, capricious or abuse of discretion standard] the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.

The Supreme Court went on to say that because the Comptroller made a contemporaneous explanation of his decision, the validity of his action must

> stand or fall on the propriety of that finding, judged, of course, by the appropriate standard of review. If that finding is not sustainable on the administrative record made, then the Comptroller's decision must be vacated and the matter remanded to him for further consideration. *Id.*

■ These two Supreme Court cases, when read together, clearly mandate that when there is a full administrative record, the court in determining if the agency action is arbitrary, capricious or an abuse of discretion should confine its inquiry to the administrative record.

**7.** 401 U.S. at 420, 91 S.Ct. at 825.

**8.** *Id.* at 420–421, 91 S.Ct. at 826.

**9.** 463 F.2d 632 (4th Cir. 1972).

In *Missouri v. Coleman*, 427 F.Supp. 1252 (D.D.C.1977), *vacated as moot, State ex rel. Missouri St. Louis Airport Authority v. Adams*, 184 U.S.App.D.C. ——, 564 F.2d 600 (Filed July 5, 1977), the plaintiffs, the State of Missouri and various cities and municipalities within the State, challenged the action of the Secretary of Transportation in conditionally approving an application for a Federal grant to acquire land for an airport in Illinois which would serve the St. Louis metropolitan area.[10] The court rejected the plaintiffs' contention that they should be allowed to take discovery, holding that: "The record to be reviewed by this Court is the record that was before the agency. This Court has no authority to make an 'administrative record.'" 427 F.Supp. at 1257. (citations omitted). The *Missouri* plaintiffs, like the plaintiffs in this case, had argued that *Overton Park* permits the court to consider evidence in addition to the administrative record. The court pointed out, however, that the plaintiffs' reliance upon *Overton Park* was "misplaced", in that the administrative record in *Overton Park* failed to recite certain required formal findings, without which that record was incomplete. "Thus," the court held, "it is clear that in *Overton Park* discovery was allowed only as an expedient in sharply limited situations." 427 F.Supp. at 1257. (footnotes omitted). The court quoted from *Doraiswamy v. Secretary of Labor*, 180 U.S.App. D.C. 360, 555 F.2d 832 (Filed November 26, 1976),

[W]hile there may be times where an agency may be called on "to more adequately explain . . . the reasons for its decision," that occasion arises only when "the bare record does not disclose the factors . . . considered or the Secretary's construction of the evidence." (footnotes and citations omitted).

427 F.Supp. at 1258, and observed that there was no reason for a "'judicial probe beyond the confines of an administrative record'" where that record affords a sufficient "'contemporaneous explanation'" of the administrative decision to permit a determination as to whether the result was arbitrary, 'capricious or an abuse of discretion. (citations omitted). *Id.*[11]

The scope of judicial review of administrative decisions has also been considered by the Third Circuit in *Dry Color Manufacturers' Association, Inc. v. Department of Labor*, 486 F.2d 98 (3d Cir. 1973). The Court in refusing to permit the defendants to introduce evidence which had not been considered by the agency stated:

> It has long been settled that in reviewing an agency action and the adequacy of an agency's articulation of its action, including findings of fact and reasoning processes, courts must look to the record that was considered by the agency and to the factual findings and reasoning of the agency—not to *post hoc* rationalizations of counsel or even agency members and not to evidentiary materials that were

---

**10.** After the district court opinion, the decision to fund the airport was reconsidered by the new Secretary of Transportation, Brock Adams, who did not approve the grant. Plaintiffs then filed in the Circuit Court an unopposed motion to vacate the appeal as moot, which was granted by the Circuit Court. The Court also remanded the case to the District Court with instructions to dismiss the complaint as moot. While it appears that this case no longer has any precedential value, we agree with its statement of the law as to scope of review.

**11.** The *Missouri* plaintiffs, like plaintiffs here, went on to criticize specific studies included in the administrative record on the grounds that those studies were inadequate as to both scope and depth, and argued that the decision should

be remanded to the agency for further study. In response to this argument, the court stated:

> The short answer to plaintiffs' contentions is that it is the administrative agency, not the Court, which is designed to have and does have the experience and expertise to implement national transportation policies; and it is the Administrator who determines how these resources are utilized in making his judgments. It is for the Secretary to decide what available studies and reports to consider and it is for him to decide whether to commission independent studies.

427 F.Supp. at 1260. (citations omitted). Further, the court was satisfied that the agency had considered all relevant factors cited by the plaintiffs.

not considered by the agency. *See, e. g., Citizens To Preserve Overton Park v. Volpe*, 401 U.S. 402, 419, 91 S.Ct. 814, 28 L.Ed.2d 136.

486 F.2d at 104, n. 8. (citations omitted in part).

■ Plaintiffs urge this Court to either grant summary judgment for plaintiffs on the ground that the administrative record shows that the Secretary's action was arbitrary and capricious, or to permit the plaintiffs to proceed with discovery and present evidence [12] which they claim will show that the Secretary's action was arbitrary and capricious. The defendants, on the other hand, urge the Court to examine the record and find that there was a rational basis for the Secretary's decision. Based upon our thorough study of the administrative record, we find that the Secretary's decision to finance the Tunnel was not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. Pursuant to the mandate of *Overton Park*, we made a "searching and careful" examination of the record [13] and, although plaintiffs have pointed out numerous areas in which the record is less than perfect, it is the finding of this Court that no single one nor any combination of the alleged deficiencies provides a basis for overturning the agency decision or remanding it.

12. For a discussion of this issue, *see* Nathanson, *Probing the Mind of the Administrator: Hearing Variations and Standards of Judicial Review under the Administrative Procedure Act and other Federal Statutes*, 75 Colum.L. Rev. 721, 767–68 (1975); *Davis, Administrative Law of the Seventies*, § 29.01–8 at 679–682 (1976).

Plaintiffs cite a number of cases in support of their contention that they should be permitted to introduce evidence outside the administrative record. In *Schicke v. Romney*, 474 F.2d 309 (2d Cir. 1973), for example, decided before *Camp v. Pitts*, the Second Circuit found that a statutorily mandated certification that the conversion of park land to a site for a community college was consistent with regional plans, was absent from the administrative record. It therefore remanded so that the record might be supplemented, suggesting, as a possibility, that on remand "it may be that the district court should allow plaintiffs the opportunity to pursue all reasonable means of discovery . . ." 474 F.2d at 319. Upon remand, the Federal defendant, HUD, submitted two affidavits which were held to remedy the deficiency in the administrative record, and the district court granted summary judgment for defendants without permitting any discovery. *Schicke v. Lynn*, 386 F.Supp. 97 (D.Conn.1974), *aff'd*, 507 F.2d 1389 (2d Cir. 1974).

Plaintiffs have cited a number of cases pursuant to the National Environmental Protection Act where courts have permitted evidence outside the administrative record to be introduced. In none of these cases is there any indication that consideration was given to the issue of going beyond the administrative record. *See, e. g., New York v. Kleppe*, Civ. Nos. 76–1226, 75–208 (E.D.N.Y., filed February 17, 1977), *rev'd sub nom. County of Suffolk v. Secretary of the Interior*, Civ. Nos. 77–6049, 77–6050 (2d Cir., filed August 25, 1977); *State of Alabama Ex Rel. Baxley v. Corps of Engineers*, 411 F.Supp. 1261 (N.D.Ala.1976); *Life of the Land v. Brinegar*, 485 F.2d 460 (9th Cir. 1973); *Environmental Defense Fund v. Tennessee Valley Authority*, 339 F.Supp. 806 (E.D.Tenn.1972), *aff'd*, 468 F.2d 1164 (6th Cir. 1972).

The Second Circuit in its recent decision in *County of Suffolk v. Secretary of the Interior, supra*, reviewed a NEPA decision of the district court stating:

> Nor was the court obligated to restrict its review to the administrative record. Although the focus of judicial inquiry in the ordinary suit challenging nonadjudicatory, nonrulemaking agency action is whether, *given the information available to the decision-maker at the time*, his decision was arbitrary or capricious, and for this purpose "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court", . . . in NEPA cases, by contrast, a primary function of the court is to insure that the information available to the decision-maker includes an adequate discussion of environmental effects and alternatives, . . . which can sometimes be determined only by looking outside the administrative record to see what the agency may have ignored. (footnotes and citations omitted) (emphasis in original). *Slip. Op.* at 5550–5551.

13. Material in the administrative record has been submitted in the form of Appendices.

III. *History Of Tunnel*

The City sought a mass transit demonstration grant prior to 1964.[14] Its preliminary application requesting $18,000,000 in Federal funds for the project was submitted on November 23, 1964. As part of its application, the City, on January 26, 1966, requested the Delaware Valley Regional Planning Commission (DVRPC) to endorse the Tunnel as part of the regional transportation system, which endorsement was made by DVRPC. DVRPC is the regional metropolitan planning organization (MPO) established by interstate compact between New Jersey and Pennsylvania charged with the preparation of long-range comprehensive plans for the region's transportation development.[15] DVRPC prepared a coordinated long-range transportation plan for the region in 1969, which it updates annually. It also prepares annually a capital improvement program which projects the region's capital needs for the forthcoming six-year period. In the capital improvement report DVRPC rated the Tunnel as having "urgent" priority.[16] At the time of its initial endorsement of the Tunnel it was not conducting any regional planning which satisfied Federal standards.[17] In May of 1967, Federal officials found that the planning effort for the region was sufficiently developed to permit projects to be funded to the extent of 50%, indicating that planning had begun but had not yet obtained a satisfactory level.[18] In 1974, the Senior Planning Representative of the Urban Mass Transportation Authority (UMTA), evaluated the status of planning in the Philadelphia area in connection with Philadelphia's grant applications for three projects, including the Tunnel. UMTA found that the planning conducted by DVRPC was sufficient to insure receipt of UMTA planning and capital assistance funds, but made some recommendations as to the planning process.[19] In 1969, the cost estimate of the project was increased to $87,500,000. In July 1970, the UMTA Administrator wrote to the City Director of Public Property stating that it would not fund the entire project because the expenditure of Federal funds for the project in the amount contemplated could not be justified and because the transit benefits of the Tunnel were minimal. It was the opinion of the UMTA staff that the Tunnel would primarily benefit the Market Street East urban renewal project. The UMTA letter of July 1970 stated that UMTA would consider funding a smaller part of the cost based solely on transportation related benefits. Throughout this period various staff analyses reflected criticisms of the Tunnel.[20]

In November 1970, the City submitted a new application based on a project cost of $87.5 million and in April DOT agreed to fund $37,000,000 or 53.33%. The City continued to revise its cost estimates; in May of 1972 it submitted a revised application based on a project cost of $164.9 million and requested a Federal grant for 66% of the project, or $109.9 million. Inadequate docu-

---

14. Approval Memorandum, at 5, App. X.

15. Authority for the establishment of an MPO is contained in 23 C.F.R. § 450.100 *et seq.* Section 450.112 provides that the MPO shall be the forum for cooperative decisionmaking by local governmental officials. *See* Memorandum of Alfred Lebeau, Regional Planner, Region III, UMTA, dated October 16, 1974, App. IX. The organization and duties of DVRPC is described in Exhibit F, Attachment I of the Grant Application filed by the City on December 31, 1973, App. I.

16. DVRPC capital program for public transportation, fiscal years 1972–1978. Table 2, p. 7, Item 48, App. XIV.

17. November 25, 1975 Memorandum of George Hartman, Planning Standards of the Department of Housing and Urban Development.

18. Memorandum from George Hartman, May 29, 1967.

19. UMTA Memorandum of June 19, 1975.

20. Memorandum of August 14, 1967 by W. B. Hurd, Deputy Director to UMTA; staff evaluation of August 26, 1969.

mentation and concern about rising costs led to an UMTA request that the City evaluate specified areas.[21] At that time DOT made funds available for technical studies, and the City and DVRPC employed the transportation engineering firm of Simpson & Curtin to prepare a Benefit/Cost Study. Its report was completed in December 1973.[22] On December 31, 1973, the City submitted another application which set forth a cost estimate of $252,000,000 and requested DOT to provide $202,000,000.[23]

During 1973 an environmental assessment was prepared by the City and its consultant, Environmental and Technology Assessments, Inc. The assessment included the results of community meetings held in 1973, the "A–95 review"[24] and public hearings held on June 29, 1973. A Draft Environmental Impact Statement (Draft EIS) was thereafter prepared and circulated by UMTA to governmental agencies and interested private parties for comments.[25] Responses to the Draft EIS were reviewed by UMTA and incorporated into the completed EIS issued in May, 1975.[26] The EIS reviewed both the short and long term adverse and beneficial impacts of the Tunnel and concluded that the project could be anticipated to produce a net environmental long term gain through the improvement of mass transportation and reduction in motor vehicle traffic and emissions in the center city area.[27]

In September 1974, UMTA requested the Transportation Systems Center (TSC), a technical agency of DOT, to conduct a quick review of the Simpson & Curtin Study. A draft of the report was completed and circulated for comments, with the final report issued November 8, 1974.[28] This report contained some criticisms of the Simpson & Curtin Study. On October 29, 1974, the City and DVRPC responded to TSC's criticisms of the Simpson & Curtin Study.[29] This response explained the basis for the figures reached in the Simpson & Curtin Study and pointed out that the areas of dispute involve judgmental differences and that the Tunnel shows a favorable value even accepting TSC's figures.

In February 1975, the then UMTA Administrator Herringer wrote to the City explaining that UMTA was prepared to approve the project but requested additional information from the City.[30] The City replied by letter of May 5, 1975.[31] On June 13, 1975, the City submitted a revised application which increased the amount of the requested grant to $240,000,000 and updat-

21. *See* Approval Memorandum at 6, App. X.

22. Simpson & Curtin Transportation Engineers, Final Draft Report Benefit/Cost Analysis of the Center City Commuter Connection, App. III.

23. Grant Application, Exhibit E, App. I.

24. Office of Management and Budget Circular A–95 requires applicants for Federal assistance to solicit comments concerning proposed projects from interested parties. *See* Intergovernmental Cooperation Act of 1968, 42 U.S.C. § 4201 *et seq.*

25. Among the agencies and parties to whom the Draft EIS was circulated for comment were the United States Environmental Protection Agency; the United States Department of Housing and Urban Development; the Council of Environmental Quality; the United States Department of Health, Education and Welfare; the Advisory Council on Historic Preservation; the Old Philadelphia Development Corporation; the Preservation Committee of the Philadelphia Chapter, Society of Architectural Historians; The Public Interest Law Center of Philadelphia (counsel for plaintiffs). EIS, Summary Sheet, ¶ 5, App. IV.

26. EIS, App. IV.

27. EIS, Summary Sheet ¶ 3; pp. 102–112a, App. IV.

28. App. V.

29. App. VI.

30. Herringer letter, App. VII.

31. App. VII.

ed the supporting documentation as to costs.[32]

On June 30, 1975, the Revised Grant Application was approved with the understanding that a grant contract setting forth the funding terms and conditions would ultimately be executed by the parties. The Approval Memorandum [33] recites the description and history of the project, as well as the costs and anticipated benefits to the City of Philadelphia and the surrounding region. The Approval Memorandum contains an analysis of the available alternatives to the project, notes that the Tunnel has been deemed the priority mass transportation project of both DVRPC and the City of Philadelphia, discusses various aspects of the project, and recommends approval of the grant. The Memorandum constitutes the final UMTA staff evaluation of the project and sets forth the statutory findings which the Secretary is required by law to make. The DOT approval was communicated to the City by Herringer's letter of July 15, 1975.

During the interval between June 30, 1975, the date of the Approval Memorandum, and early 1977, extensive negotiations occurred between the City of Philadelphia and DOT regarding the specific details of the grant, culminating in the Grant Contract.[34] The Grant Contract, dated January 12, 1977, embodies the final arrangements between the parties.[35] The Grant Contract was accompanied by a letter from Secretary Coleman to Mayor Rizzo [36] setting forth the understanding between the City of Philadelphia, the Philadelphia Building and Construction Trades Council (as representative of the area's labor unions), representatives of the Philadelphia business and financial communities and DOT regarding the construction of the Tunnel. This letter recites the history of public and private support for the project and refers to the meetings held among DOT and the various public and private proponents of the Tunnel.

## IV. Urban Mass Transportation Act Requirements

Recognizing the need for the development of comprehensive and coordinated mass transportation systems in metropolitan areas, Congress in 1964 passed the Urban Mass Transportation Act (UMT Act), 49 U.S.C. § 1601 et seq. This Act, as amended in 1970, provides for a program of Federal loans and partial grants to assist States and Municipalities in financing the extension and improvement of public urban mass transportation systems. H.R.Rep.No. 204, 88th Cong., 2d Sess. (1964), 1964 U.S. Code Cong. & Admin.News 2569 (hereinafter H.R.). In commenting on the need for this Act, the House Report notes that efficient and economical mass transportation, which is vital to the people who live in and around urban areas, is not now available and will become even less available in the future as the country's population continues to increase. H.R. at 2571. The Report points to the plight of mass transportation systems caught in the vicious cycle of being forced by rising costs and declining patronage to raise fares, which action then creates a further ridership loss. Id. The UMT Act is a broad congressional delegation to the Secretary of Transportation to make grants or loans to States and local public bodies "on such terms and conditions as he may prescribe" in order to finance the acquisition, construction, or improvement of

---

32. Revised Application of the City of Philadelphia For A Transportation Capital Improvement Grant Under The Urban Mass Transportation Act of 1964 for the Center City Commuter Rail Connection, App. VIII.

33. Approval Memorandum, App. X.

34. Urban Mass Transportation Capital Grant Contract Between The City of Philadelphia and the United States, App. XIII.

35. The Grant Contract consists of two parts. Part I sets forth the specific financial arrangements between UMTA and the City. Part II contains the general "terms and conditions" applicable to UMTA capital grants.

36. Letter from Secretary Coleman to Mayor Rizzo, dated January 12, 1977, accompanying Grant Contract, App. XIII. The letter was co-signed by Mayor Rizzo on behalf of the City, by the Honorable George X. Schwartz, as President of the City Council, and by various individuals representing Philadelphia business and financial institutions.

facilities and equipment for use in mass transportation in urban areas. 49 U.S.C. § 1602(a)(1). This grant of authority is subject to limitations contained in specific statutory criteria established by the Act. The UMT Act requires the Secretary to make specific findings with respect to those criteria as a condition of any grant approval.

### A. Financial And Technical Capacity

■ Pursuant to the UMT Act, 49 U.S.C. § 1602(a)(1)(A), the Secretary must determine that the applicant possesses the legal, financial and technical capacity to carry out the proposed project. These findings were made in the Approval Memorandum of June 30, 1975.[37]

Plaintiffs allege in their complaint that the construction of the Tunnel will require substantial sums in addition to the amount currently projected, and that the City's fiscal crisis and cash-flow problems demonstrate the City's inability to bear the financial burden of constructing the Tunnel. In this connection the plaintiffs discuss the financial problems of Philadelphia and remind us of the fate of New York City. However, it is generally recognized that the financial problems of all our cities have, at least in part, resulted from the flight of industry and residents to the suburbs. This situation, together with the inability of cities to provide an efficient transportation system, is the very problem which prompted Congress to provide transportation funds to the cities through passage of the UMT Act.

H.R. at 2571–75. It is certainly not arbitrary or capricious to carry out the very purpose of the UMT Act.

In reviewing the City's documentation in support of its grant application, the Approval Memorandum states that sufficient funds have already been guaranteed to meet the local share for the project's initial funding of $25,000,000.[38] The Approval Memorandum states the cost of the project to be $300,000,000.[39] Of this amount the Federal government is committed to provide 80%, or $240,000,000. When the grant was approved UMTA required the City to demonstrate its ability to provide the balance of the funds, $60,000,000.[40] In a letter from Lennox Moak, Director of Finance of the City of Philadelphia, to Robert Patricelli, Administrator of UMTA, dated August 13, 1976, a detailed plan for the financing of the City's share of the project is set forth.[41] One-half of the local cost, $30,000,000 will be provided by the Commonwealth of Pennsylvania.[42] The remainder of the cost will be provided by the City from general obligation bond authorization.[43] As pointed out in the Moak letter, if these measurements prove inadequate the City's borrowing capacity and unrestricted taxing power in a number of areas are sufficient to insure that Philadelphia will be able to finance its share of the project. From the documents in the record, we find that the Secretary's finding that the City has the financial capability to carry out its share of the local cost of the project is not arbitrary or capricious.[44]

$28,445,001 of general obligation bond authorizations of which $22,662,000 has been appropriated. Moak letter, App. X.

---

37. App. X.

38. Approval Memorandum at 12, App. X.

39. The first cost estimate of $37,915,950 was made in 1961. Environmental Impact Statement at 90, App. IV. It has been periodically updated.

40. Approval Memorandum at 12, App. X.

41. App. XII.

42. Letter of August 12, 1976 from William H. Sherlock, Secretary of Transportation, to Robert Patricelli, App. XII.

43. The City has already expended $6,201,901 on the project. It currently has authorized

44. Plaintiffs also point out that on February 28, 1975, the UMTA Administrator at the time, Frank Herringer, sent a letter to the City explaining that UMTA was prepared to approve the project subject to receiving information specifying, among other things, the cost of capital improvements related to the project which might be needed to improve the efficiency of the Philadelphia region's commuter rail network. App. VII. In response to Herringer's letter the City submitted on May 5, 1975 a five part report developed under the direction of William Grabske, the City's Transportation

Plaintiffs also allege that the Secretary's finding that the City has or will have the technical ability to carry out the project is arbitrary and capricious. In support of this argument they cite several memoranda of UMTA officials which criticize the City's past performance in handling UMTA projects. There is no dispute by defendants concerning the existence of such criticism. Defendants do contend, however, that the criticism does not demonstrate that the City lacks sufficient technical ability to undertake the project. Plaintiffs call attention to the memorandum of February 24, 1975 from Joseph T. Mayer, Regional Engineer for UMTA III, to Franz Gimmler, Regional Director for UMTA III, in which the City's management of the Penn Central Plaza complex, the Frankford elevated rail relocation, and the airport rail line were criticized.[45] Certain portions of the Mayer memorandum were incorporated in the letter of February 28, 1975 from Frank Herringer, the then UMTA Administrator.[46] In this letter, Herringer requested information specifying the engineering, design, land acquisition and construction schedule for the Tunnel. The City's letter in response contained twenty-three exhibits and set forth an in-depth systematic program for completion of the Tunnel, including a construction schedule. The City's letter also details the operating agreements between the City and the Southeastern Pennsylvania Transportation Authority (SEPTA) in connection with the management of the Tunnel and the source of the matching funds. Plaintiffs contend that the City's detailed response to the Herringer letter could not

form the basis of the Secretary's finding that the City possessed the technical ability to carry out the project. We do not agree. The Secretary's finding that the City has the technical ability to carry out the project is not arbitrary, capricious, or an abuse of discretion.

**B.  *Satisfactory Continuing Control***

Section 1602(a)(1)(B) of the UMT Act requires the Secretary to make a determination that the applicant has or will have:

> satisfactory continuing control, through operation or lease or otherwise, over the use of the facilities and equipment.

This finding was made by the Secretary and is contained in the Approval Memorandum.[47] Plaintiffs allege in the complaint that the fiscal crisis of Philadelphia, the failure of the state legislature to authorize additional funds for construction, and the impossibility of the City's performance of its promise to make needed associated improvements preclude the Secretary from making such a finding.

The purpose of § 1602(a)(1)(B) is to assure that the project will become, and will remain, operational. The applicant may provide the assurances either by owning and operating the facilities itself or by providing for its operation by a third party through a lease or similar arrangement.[48] This allows the applicant the option to manage the facilities itself or to lease them.

In the City's initial Grant Application of December 31, 1973[49] it set forth the extent of its control over the project. The Tunnel itself and all other capital improvements

---

Deputy. App. VII. Section 2 of that report delineates projects which the City believed to be necessary for the improvement and expansion of commuter service and which should be implemented concurrent with the construction of the Tunnel. The estimated cost of these additional improvements is $393,000,000. Plaintiffs argue that when this additional amount is added to the estimated cost of the Tunnel there is no basis for the Secretary's finding that the City has or will have the financial ability to carry out the project. However, it is obvious that these additional projects, although they will enhance the commuter system, are not required for the implementation of the Tunnel.

**45.** In plaintiffs' memorandum they point to the following documents: Hurd memorandum of August 14, 1967; "Staff evaluation" of August 26, 1969; Torp memorandum, October 15, 1974; Gimmler memorandum, December 17, 1974.

**46.** App. VII. Heretofore discussed at n. 44.

**47.** App. X.

**48.** H.R. at 2580, 2585.

**49.** Exhibit H, App. I.

comprising the project will be owned by the Pennsylvania Transportation Assistance Authority to the extent of the Commonwealth's 10% investment in the project.[50] The remaining 90% will be owned by the City.[51] At the time of the Grant Application it was contemplated that the facilities would be held by the City under a direct lease with the railroads. This information was updated, however, in the City's response of May 5, 1975 [52] to the Herringer letter which contained correspondence between SEPTA and the City regarding the status of the management agreement under which SEPTA either directly or through contract with Conrail will manage the Tunnel. On the basis of the material in the record heretofore discussed, as well as § 108 of the Grant Contract,[53] which prohibits the City from executing any lease, pledge, mortgage, lien or other contract with respect to the project without the express written authorization of DOT and prohibits the City from impairing its continuing control over the use of project facilities and equipment, we find that the Secretary's finding that the City has or will have satisfactory continuing control over the project is not arbitrary, capricious or an abuse of discretion.

### C. Continuing, Cooperative And Comprehensive Regional Planning Process

■ Section 1603(a) of the UMT Act requires the Secretary to make a determination that:

. . . the facilities and equipment for which the assistance is sought are needed for carrying out a program, meeting criteria established by [the Secretary], for a unified or officially coordinated urban transportation system as part of the comprehensively planned development of the urban area, and are necessary for the sound, economic, and desirable development of such area.

The Approval Memorandum contains a finding pursuant to § 1603(a).[54]

Plaintiffs allege that the Secretary's findings pursuant to § 1603(a) are arbitrary and capricious because the administrative record does not show that the Tunnel is needed for carrying out a unified transportation system as part of the comprehensively planned development of the urban area. Plaintiffs contend that it was arbitrary and capricious for the Secretary to certify as satisfactory a planning process which did not compare the benefits from alternative transportation projects, which did not rank projects by comparative benefits, and where the designation of priorities was determined by factors not relevant to the UMT Act. Plaintiffs specifically attack two documents in the record—the Simpson & Curtin Study and the Review by the Transportation Systems Center (TSC).

### 1. Simpson & Curtin Study

The Simpson & Curtin Study was undertaken to determine whether the anticipated

---

**50.** Id.

**51.** Id.

**52.** Section 3 (Operating Agreements), App. VII.

**53.** Part II of Grant Contract, App. XIII.

**54.** Section 1602(a)(2), cited by plaintiffs, is substantially similar to § 1603 and is expressly made prospective to projects approved on or after July 1, 1976. In this case approval of the Tunnel was given on June 30, 1975, more than one year prior to the effective date of this provision. Approval Memorandum, App. X. Section 1602(a)(2) provides in part:

[T]he Secretary shall cooperate with the States in the development of long-range plans and programs which are properly coordinated with plans for improvements in other

affected forms of transportation and which are formulated with due consideration to their probable effect on the future development of urban areas of more than fifty thousand population. The development of projects in urbanized areas under this section shall be based upon a continuing, cooperative, and comprehensive planning process covering all modes of surface transportation and carried on by the States and the governing bodies of local communities in accordance with this paragraph. The Secretary shall not approve any project in an urbanized area after July 1, 1976, under this section unless he finds that such project is based on a continuing comprehensive transportation planning process carried on in conformance with the objectives stated in this paragraph.

project benefits outweighed the costs and whether the project represented a prudent investment of government funds. It identified the objectives which a proposed transportation project should fulfill,[55] and proposed alternative solutions [56] which it analyzed on a pass/fail basis in light of these objectives. In discussing alternatives, Simpson & Curtin concluded that the renovation of the Suburban Station and the Reading Terminal and purchasing 25 new commuter cars (this alternative has been and will continue to be referred to as the Null case) should be considered a strong competitor to the Tunnel project.[57] The Study then quantified the benefits of the Tunnel project. It found that 90% of the project benefits accrue to three groups of consumers: existing rail users who will experience travel time savings; riders diverted from other transportation modes who will experience travel time savings and savings associated with less frequent car use (operating, owning and parking); and highway users who will experience travel time savings. The Study projected the increase in rail ridership with and without the Tunnel and also the number of persons expected to switch from cars to the rail system. Time saved was accorded a monetary value, which was multiplied by the number of riders and amount of time saved. All of the quantified benefits were then added together. In addition to transportation benefits, developmental benefits not included in the cost benefit analysis were discussed.[58] It was pointed out that these benefits included increased revenues to the

City. Environmental benefits were also recognized, but not quantified.[59]

The Simpson & Curtin Study described and quantified projected costs for both the Tunnel and the Null case. The net result was a benefit/cost ratio favorable to the Tunnel and the Study concluded in favor of the Tunnel.

Plaintiffs criticize the Simpson & Curtin Study on several grounds. They claim: that the figures for increased rail users used by Simpson & Curtin was too high; that Simpson & Curtin's estimate as to the number of persons who would switch from automobiles to the Tunnel is too high because rail fares may, in the future, increase faster than automobile costs; and that the figure used by Simpson & Curtin to value time savings to commuters was too high. None of these criticisms have convinced the Court that the Secretary's reliance on the Simpson & Curtin Study was arbitrary, capricious, or an abuse of discretion.

### 2. Transportation Systems Center Report

The plaintiffs also attack the TSC Report,[60] claiming that its criticism shows the inadequacy of the Simpson & Curtin Study. The plaintiffs also allege that the TSC Report is inadequate. As pointed out by TSC, the Simpson & Curtin Study is only one element of the total information used by UMTA in its consideration of the funding request. The TSC Report accepted the cost projections made by the Simpson & Curtin Study. It found that the Suburban Station

55. These include: providing additional public transportation capacity; establishing a region wide public transportation framework for efficient growth; improving accessibility of activity centers in downtown Philadelphia, thereby increasing prosperity of the Delaware Valley; enhancing the convenience and attractiveness of the mass transit system; and streamlining the transportation network to improve operating capacity. P. 13, App. III.

56. The proposed alternatives were: connecting the two existing regional railroads at a point inside the Central Business District (CBD); region wide highway and transit improvements with minimal rail improvements, known as the Null case; region wide highway and transit improvements with a CBD circulator transit

system; region wide highway and transit improvements with the substitution of an inter-railroad connection north of the CBD; no action alternatives; expanding the highway system and restricting highway travel by means of controls. Pp. 13 and 14, App. III.

57. P. 14, App. IV. See Simpson & Curtin Technical Supplement No. 1 for a complete discussion of alternatives.

58. Pp. 21–22, 50–59, App. IV.

59. Pp. 59–68, App. IV.

60. App. V.

and the Reading Terminal are presently operating near capacity at peak hours, and that the Tunnel will create more terminal capacity than the Null case. The TSC Report reduced the benefits delineated by Simpson & Curtin because it found that Simpson & Curtin had overestimated the ridership growth rate after 1985. The TSC Report recognized that there are no generally accepted standards for urban transportation investment evaluation, but stated that in its opinion the Simpson & Curtin Study should have used another method in identifying which of the alternatives met the transportation objectives identified by Simpson & Curtin.[61]

The Court recognizes that experts in the field of transportation can have divergent opinions. The plaintiffs' criticism of these reports has not furnished this Court with a basis to find that the Secretary's decision was arbitrary, capricious, or an abuse of discretion.

It appears from a reading of the complaint that plaintiffs' attack is in part directed to the wisdom of the decision by DVRPC to assign a high priority to the Tunnel. In paragraph 90 of the complaint, for example, plaintiffs allege that the DVRPC 1985 Plan is not comprehensive because it proposes higher expenditures for highways than for mass transit, and because the largest portion of the mass transit allocation for the period will be used for the Tunnel and associated improvements to the commuter railroads. In paragraph 91, plaintiffs allege that the decision to fund the Tunnel cannot have been based on a continuing, comprehensive transportation planning process because the project would preclude funds from being applied toward improvements in the Broad Street subway service, the Market-Frankford elevated system, and bus service in the City. Even if plaintiffs are correct as to the impact of the grant on the availability of funds for other transportation projects, that fact would not establish a flaw in DVRPC's planning process, but would merely evidence the disa-

greement between plaintiffs and DVRPC as to the appropriate transportation priorities of the region. The fact that plaintiffs can propose an alternative set of priorities does not establish that the Secretary's deference to the rendering of those priorities by the local authorities was arbitrary or capricious. This record provides no basis for this Court to find that the Secretary's finding pursuant to § 1603 was arbitrary, capricious, or an abuse of discretion.

D. *Certifications Required By The City*

Section 1602(d) of the UMT Act states:

> Any application for a grant or loan . . . which will substantially affect a community or its mass transportation service shall include a certification that the applicant—
>
> (1) has afforded an adequate opportunity for public hearings pursuant to adequate prior notice, and has held such hearings unless no one with a significant economic, social, or environmental interest in the matter requests a hearing;
>
> (2) has considered the economic and social effects of the project and its impact on the environment; and
>
> (3) has found that the project is consistent with official plans for the comprehensive development of the urban area.
>
> . . . If hearings have been held, a copy of the transcript of the hearings shall be submitted with the application.

These certifications are found in the Approval Memorandum.[62] Pursuant to the provisions of the Act, the City conducted a public hearing on the Tunnel on June 29, 1973. This hearing followed community meetings previously held by the City on March 15 and April 18, 1973.

The transcript of the public hearing reveals that speakers in opposition to the project were given wide latitude to express their views. Many were knowledgeable

---

**61.** ii, 26, App. V.

**62.** App. X.

concerning the transportation problems of their communities, and they proposed a variety of solutions.[63] In a supplement to the Grant Application[64] the City supplied a written response to the significant issues raised at the public hearing.

Plaintiffs contend that the hearings were not adequate because the Simpson & Curtin Report commissioned by the City was not completed until six months after the hearings and the Draft EIS was not circulated until almost a year after the hearings. Plaintiffs further allege that the hearing was unsatisfactory because at the time it was held the project cost was estimated at $165,000,000.

An examination of the transcript of the public hearing and the published response of the City to the questions raised at the public hearing have convinced the Court that the requirements of § 1602(d)(1) were fulfilled. We also find that the requirements of § 1602(d)(2) and (3) were fulfilled by the City's preparation of a Draft EIS which was forwarded to and reviewed by UMTA.[65]

### E. Findings Re Environment

Section 1610(a) of the UMT Act provides:

(a) It is hereby declared to be the national policy that special effort shall be made to preserve the natural beauty of the countryside, public park and recreation lands, wildlife and waterfowl refuges, and important historical and cultural assets, in the planning, designing, and construction of urban mass transportation projects for which Federal assistance is provided pursuant to section 1602 of this title.

Section 1610(b) requires the Secretary to review each transcript of hearing submitted pursuant to section 1602(d) of this title to assure that an adequate opportunity was afforded for the presentation of views by all parties with a significant economic, social, or environmental interest, and that the project application includes a detailed statement on—

(1) the environmental impact of the proposed project,

(2) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(3) alternatives to the proposed project, and

(4) any irreversible and irretrievable impact on the environment which may be involved in the proposed project should it be implemented.

The Secretary must review these statements and make appropriate findings in writing pursuant to § 1610(c). These findings are contained in the Approval Memorandum.[66] The requirements imposed upon the Secretary by § 1610 are substantially the same as those imposed by the DOT Act, 49 U.S.C. § 1653 and the National Environmental Protection Act, 42 U.S.C. § 4321 et seq. Both of these Acts are hereinafter discussed.

### V. Requirements For The Handicapped And Elderly As Set Forth In The Urban Mass Transportation Act And Rehabilitation Act

Section 1612(a) of the UMT Act provides:

(a) It is hereby declared to be the national policy that elderly and handicapped persons have the same right as other persons to utilize mass transportation facilities and services; that special efforts shall be made in the planning and design of mass transportation facilities and services so that the availability to elderly and handicapped persons of mass transportation which they can effectively utilize will be assured; and that all Federal programs offering assistance in the field of mass transportation (including the pro-

---

**63.** App. II.

**64.** A complete transcript of the public hearings accompanied the Grant Application. Grant Application, Exhibit J, App. I. The transcript is separately set forth in App. II.

**65.** Grant Application, Exhibit L, App. I; Final EIS, Preface, App. IV.

**66.** App. X.

grams under this chapter) should contain provisions implementing this policy.

Plaintiffs allege that the defendants have violated this section and also § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.[67] These statutes impose affirmative obligations on recipients of Federal funds to assure that the special needs of the elderly and handicapped are sufficiently met.

The Grant Application[68] provides that the new station to be constructed between 10th and 12th Streets shall include escalators and elevators on new and reconstructed train platforms, ramps to accommodate changes in grade, and grab bars and wide-entry passageways in public restrooms to assure access to persons confined to wheelchairs. Plaintiffs contend that the improvements to the new station are insufficient to meet the requirements of the two Acts because the 196 other stations linked in the commuter network will not be similarly equipped.

On April 27, 1976 UMTA issued regulations, pursuant to the UMT Act and the Rehabilitation Act, establishing its requirements in connection with transportation for elderly and handicapped persons. 49 C.F.R. § 609.1 *et seq.* Although these regulations apply to projects approved by the UMTA Administrator on or after May 31, 1976, certain sections apply to fixed facilities and vehicles included in projects approved prior to that date.[69] 49 C.F.R. § 609.13 establishes standards for fixed facilities designed, constructed or altered on or after May 31, 1976. Subsection (c)(2) of this Section provides that these standards do not apply to the unaltered portions or items of an existing fixed facility. Thus, the construction of the Tunnel does not violate either the UMTA Act or the Rehabilitation Act, since the regulations require only that new facilities, and not existing fixed facilities, take into account the needs of the handicapped. The Tunnel is a significant first step in making the commuter rail system available to the elderly and handicapped. As additional stations of the system are improved, it will be necessary to make them similarly accessible.

VI. *Requirements For Preservation Of Public Parks And Historic Buildings As Set Forth In The Department Of Transportation Act And The Historic Preservation Act*

Section 4(f) of the DOT Act of 1966, 49 U.S.C. § 1653(f) provides:

. . . the Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.

▆▆▆ Plaintiffs allege that the defendants violated § 4(f) in that a portion of "parkland" abutting 8th Street, between Poplar and Brown Streets, currently used as a neighborhood playground, will be utilized as part of the transitional grade between the Tunnel portal and the existing railroad viaduct.

The playground and its relation to the project, along with various alternatives to the partial taking, are discussed in detail in the EIS, including a description of the park, the project's impact on the area, and six proposed alternatives.[70] UMTA found that each of the alternatives was either technically infeasible or would adversely affect low-income housing or church property lo-

---

67. This statute provides that:
    No otherwise qualified handicapped individual . . . shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

68. Exhibit M, App. I.

69. 49 C.F.R. § 609.5.

70. EIS at 151–164, App. IV.

cated in the neighborhood. The EIS also discusses the measures to be taken to mitigate any damage to the playground, including the acquisition of adjacent ground for the purpose of replacing the small area being taken.[71] We find that the administrative record discloses that the Secretary's findings and determinations with respect to the "parkland" were not arbitrary, capricious, or an abuse of discretion and were not a violation of § 4(f) of the DOT Act.

Plaintiffs also allege that the project will ultimately result in the abandonment and destruction of the Reading Terminal in violation of the following: § 4(f) of the DOT Act; the Historic Preservation Act of 1966, 16 U.S.C. § 470 *et seq.*; and Executive Order 11593, 36 Fed.Reg. 8921 (May 13, 1971). Section 106 of the Historic Preservation Act[72] provides:

> The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State . . . shall, prior to the approval of the expenditure of any Federal funds on the undertaking . . . take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under sections 470i to 470n of this title a reasonable opportunity to comment with regard to such undertaking.

Executive Order No. 11593 is a similar general directive to Federal agencies concerning the administration of Federal programs which may affect historic sites.

The EIS lists 17 buildings and structures which might potentially be affected by the project; in particular, the possible impact on the Reading Terminal and train shed and the Reading Terminal Market are discussed in detail.[73] The EIS considered various alternative alignments of the Tunnel in an effort to avoid any impact on the Reading Terminal, but concluded that any such realignment was infeasible.[74] Also included in the EIS is an engineering study to determine the feasibility of underpinning the structure[75] and a Memorandum of Agreement between UMTA and the Advisory Council on Historic Preservation, acknowledging that the plan developed to underpin the structure "will satisfactorily mitigate any adverse effects on the National Register properties in question."[76] We find that the effect of the Tunnel on historic buildings was adequately considered and that the Secretary's actions concerning them were not arbitrary, capricious, or an abuse of discretion and did not violate the applicable statutes and executive order.

## VII. *Alternatives Considered Pursuant To The National Environmental Protection Act*

The plaintiffs contend that the Environmental Impact Statement (EIS) violates the

---

71. The area to be taken amounts to approximately 1 acre of ground, or about 22% of the existing playground. The program to mitigate the impact includes the construction of a new recreation center and a swimming pool. An additional adjacent 2.2 acre tract is to be acquired for the construction of a new, floodlighted baseball field. EIS at 163–164, App. IV. As of April 25, 1975, the first phase of the program, consisting of the construction of the new building and swimming pool, had been completed. The City Ordinance for the acquisition of the adjacent ground for the ballfield had been signed into law and title reports obtained. Other major improvements to the existing playground are committed in the City's capital budget and will be carried out during or shortly after the construction of the new rail viaduct. Appendix XI to EIS, App. IV.

72. 16 U.S.C. § 470f.

73. EIS at 164–77, App. IV.

74. Alternative alignments were considered and ruled out because of their threat to other historic buildings, the conflict with the existing subway system and interference with utilities facilities. EIS at 171–72, App. IV.

75. This study was prepared by Day & Zimmerman, Inc., design consultants for the section of the project between 10th and 12th Streets. EIS at 172–73 and Attachment VII to EIS, App. IV.

76. Attachment XVI to EIS, App. IV. The impact mitigation plan includes other potentially affected structures such as the Masonic Temple located at Broad and Filbert Streets.

National Environmental Protection Act (NEPA), 42 U.S.C. § 4331 *et seq.* NEPA has been the subject of extensive litigation since its enactment in 1969. It is well settled that it imposes upon administrative agencies both procedural and substantive requirements which must be carried out prior to the commitment of Federal funds to a particular project. Section 101, 42 U.S.C. § 4331, which contains the basic policy requirements, mandates that the Federal government use all practical means consistent with other essential considerations of national policy to improve and coordinate Federal functions, programs, and resources in order to achieve a broad range of environmental goals. To accomplish the environmental goals set by Congress, § 102(2)(C), 42 U.S.C. § 4332(2)(C) establishes certain procedural requirements. Federal agencies must:

> (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
>
> (i) the environmental impact of the proposed action,
>
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
>
> (iii) alternatives to the proposed action,
>
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
>
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

■ The "detailed statement", known as the EIS, serves several basic purposes. *Minnesota Public Interest Research Group v. Butz,* 541 F.2d 1292 (8th Cir. 1976), *cert. denied* 430 U.S. 922, 97 S.Ct. 1340, 51 L.Ed.2d 601 (1977). It requires an agency to compile an environmental record from which a court can determine whether the agency has made a good faith effort to consider the values NEPA seeks to protect.

*Sierra Club v. Morton,* 510 F.2d 813, 820 (5th Cir. 1975); *Silva v. Lynn,* 482 F.2d 1282, 1284 (1st Cir. 1973). To accomplish this, the statement must not merely catalog environmental facts, but also explain fully its course of inquiry, analysis and reasoning. *EDF v. Froehlke,* 473 F.2d 346, 351 (8th Cir. 1972). Second, the statement serves as an environmental full disclosure tool by providing information to the public about the environmental costs involved in a particular project. *Id.; Sierra Club v. Morton,* 510 F.2d at 820. Third, the EIS requirement ensures the integrity of the process by requiring reasoned analysis in response to conflicting data or opinions on environmental issues. *Silva v. Lynn,* 482 F.2d at 1285. The detailed statement serves to gather together a discussion of the relative impacts of alternatives so that the reasons for the choice of alternatives are clear.

■ Whether or not an agency has fulfilled the procedural requirements of Section 102 is subject to a stricter review than compliance with substantive requirements. As stated by the District of Columbia Court of Appeals in *Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Commission,* 146 U.S.App.D.C. 33, 39, 449 F.2d 1109, 1115 (1971):

> We conclude, then, that Section 102 of NEPA mandates a particular sort of careful and informed decisionmaking process and creates judicially enforceable duties. The reviewing courts probably cannot reverse a substantive decision on its merits, under Section 101, unless it be shown that the actual balance of costs and benefits that was struck was arbitrary or clearly gave insufficient weight to environmental values. But if the decision was reached procedurally without individualized consideration and balancing of environmental factors—conducted fully and in good faith—it is the responsibility of the courts to reverse.

A number of courts have emphasized that NEPA does not require perfection in an EIS. *See Save Our Invaluable Land (Soil), Inc. v. Needham,* 542 F.2d 539, 543 (10th

Cir. 1976).[77] In *Natural Resources Defense Council, Inc. v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827 (1972), the Court said:

> So long as the officials and agencies have taken the "hard look" at environmental consequences mandated by Congress, the Court does not seek to impose unreasonable extremes or to interject itself within the area of discretion of the executive as to the choice of action to be taken. (footnotes omitted).

██ Plaintiffs' contention that the EIS does not adequately consider alternatives is predicated on two subsections of § 102. Subsection (C)(iii) requires that the EIS include a consideration of the "alternatives to the proposed action." Subsection (E) provides that the agency shall:

> study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.

These statutes are designed to provide agencies with the environmental effects of both the proposals and the alternatives for consideration along with other factors in the public interest. *Natural Resources Defense Council v. Morton, supra,* 148 U.S. App.D.C. at 13, 458 F.2d at 835.

NEPA established the Council on Environmental Quality (CEQ), 42 U.S.C. § 4342, which formulated guidelines, codified at 40 C.F.R. § 1500 *et seq.* to assist Federal agencies in the preparation of EIS's. 40 C.F.R. § 1500.8(a)(4) requires that each EIS examine:

(4) Alternatives to the proposed action, including, where relevant, those not within the existing authority of the responsible agency . . .. A rigorous exploration and objective evaluation of the environmental impacts of all reasonable alternative actions, particularly those that might enhance environmental quality or avoid some or all of the adverse environmental effects, is essential. Sufficient analysis of such alternatives and their environmental benefits, costs and risks should accompany the proposed action through the agency review process in order not to foreclose prematurely options which might enhance environmental quality or have less detrimental effects. Examples of such alternatives include: the alternative of taking no action or of postponing action pending further study; alternatives requiring actions of a significantly different nature which would provide similar benefits with different environmental impacts (e. g., . . . mass transit alternatives to highway construction); alternatives related to different designs or details of the proposed action which would present different environmental impacts . . .; alternative measures to provide for compensation of fish and wildlife losses, including the acquisition of land, waters, and interests therein. In each case, the analysis should be sufficiently detailed to reveal the agency's comparative evaluation of the environmental benefits, costs and risks of the proposed action and each reasonable alternative . . ..[78]

---

77. The *Eighth Circuit in Environmental Defense Fund v. Corps of Engineers,* 470 F.2d 289, 296–297 (8th Cir.), *cert. denied,* 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1972) rejected the contention that an EIS must be perfect, holding that only good faith and objectivity must be demonstrated.

78. The requirement of considering alternatives is explained in *New York v. Kleppe,* Civ. Nos. 76–1226, 75–208 (E.D.N.Y., filed February 17, 1977), *rev'd,* Civ. Nos. 77–6049, 77–6050 (2d Cir., filed August 25, 1977), as reported in 9 ERC 1798, 1818:

> No NEPA requirement has ever received greater judicial emphasis than that which prescribes "a detailed statement" and ade-

quate discussion and consideration of reasonable "alternatives to the proposed action." 42 U.S.C. § 4332. The significance of this one section of the Environmental Impact Statement with respect to the NEPA process as a whole has been stressed repeatedly. *Natural Resources Defense Council v. Callaway,* 524 F.2d 79, 92 (2d Cir. 1975); *Chelsea Neighborhood Association v. U. S. Postal Service,* 516 F.2d 378, 386–88 (2d Cir. 1975); *Monroe County Conservation Society v. Volpe,* 472 F.2d 693, 697–98 (2d Cir. 1972); *Natural Resources Defense Council v. Morton,* 388 F.Supp. 829, 834 (D.D.C.1974); *aff'd,* 527 F.2d 1386 (D.C.Cir. 1976); *Calvert Cliffs' Coordinating Committee v. A.E.C.,* 146 U.S. App.D.C. 33, 37, 449 F.2d 1109, 1114 (D.C.

Plaintiffs allege that the EIS does not properly analyze the alternatives that it has identified. The Tunnel, as originally proposed and as described in the EIS, is designed to maximize the utilization of the existing commuter rail network by integrating the system and increasing the peak hour capacity of the center city terminals, thereby increasing the number of riders of the railroads as an alternative to utilization of private cars and buses.[79] The EIS considered the following nine alternatives to the Tunnel: an alternative alignment of the proposed location; a personal rapid transit consisting of a modified loop bus, moving sidewalks, and/or an underground or overground system; utilization of existing freight lines for passenger service in the northeast section of Philadelphia County; expansion of the subway system; expansion of the trolley or bus system; construction of a monorail system; administrative controls to discourage use of automobiles in the center city; expansion of the highway system; and a no-action alternative.[80] Each of these alternatives was described and evaluated, with the conclusion that none constituted a reasonable alternative to the Tunnel. The three alternatives found to offer the most benefits and fewest adverse effects—no action, building additional highways, and imposition of administrative controls—were compared with the Tunnel to determine the degree of environmental impact resulting from each proposal.[81] To

accomplish this evaluation, the four were assigned a numerical value relating to each significant environmental function of the region as a whole, and were separately analyzed as to the impact on different locations (the Philadelphia Metropolitan Region, the Central Business District, and the Poplar Street Community) at different times (during construction and during normal operations).[82] Each rating was quantified, charted[83] and explained. The analysis concluded that the Tunnel presented the most favorable benefits and fewest adverse effects. It was found that the Tunnel will significantly reduce reliance on the motor vehicle as the principal means of transportation and will increase accessibility and use of mass transit, which will, in turn, lead to a reduction in traffic congestion and an improvement in air pollution.[84]

The negative impacts of the Tunnel were also considered.[85] Long term adverse effects included land acquisition, demolition of building, business and employee displacement and disruption of the East Poplar Street Playground. Short term adverse environmental effects included construction noise, dust, solid waste and spoils, and temporary disruption of traffic, utility, and community services.[86] Plans to mitigate the negative impacts, particularly in the Popular Area, which is the area of immediate construction, were addressed.[87]

Cir. 1971). See also, Council on Environmental Quality Guidelines, 40 C.F.R. § 1500.-8(a)(4). As stated by the Court of Appeals for the Second Circuit in *Natural Resources Defense Council v. Callaway*, 524 F.2d 79, 92–93 (2d Cir. 1975):

It is absolutely essential to the NEPA process that the decisionmaker be provided with a detailed and careful analysis of the relative environmental merits and demerits of the proposed action and possible alternatives, a requirement that we have characterized as "the linchpin of the entire impact statement," *Monroe County Conservation Society v. Volpe*, 472 F.2d at 697–98. Indeed the development and discussion of a wide range of alternatives to any proposed federal action is so important that it is mandated by NEPA when any proposal "involves unresolved conflicts concerning alternative uses of available resources. 42 U.S.C. Section 4332(2)(D)."

**79.** EIS at 6, App. IV.

**80.** *Id.* at 143–150a.

**81.** *Id.* at 74–90.

**82.** *Id.* at 72–84.

**83.** *Id.* at 76a–77.

**84.** *Id.* at 84.

**85.** *Id.* at 113–141.

**86.** A comparative analysis of long term and short term impact was made, along with a determination of the extent of irreversible commitment of resources. *Id.* at 178–179.

**87.** *Id.* at 86–89.

The plaintiffs attack the EIS's consideration of alternatives on several grounds. They contend that this evaluation is lacking in detail and documentation. The EIS explains the process by which alternatives were selected and evaluated. The transportation system alternatives were developed from a multidisciplinary team's compilation of environmental conditions, regional goals, specific regional transportation objectives, and unquantified environmental amenities and values. The impact of each feasible alternative was then assessed in terms of effects that most tend to improve the quality of human life of the region both by establishing a better environmental balance and by alleviating any existing untoward and potentially catastrophic conditions.[88]

The plaintiffs contend that the charts which compare the environmental impacts of the alternatives[89] are insufficient because they do not tell the name of the person compiling the charts, the field he came from, the method he used, and what data was used as a basis. The EIS devotes 40 pages to a detailed consideration of the benefits and adverse effects of the Tunnel and the alternatives. Such areas as the reduction of air pollution from automobiles, problems relating to spoil disposal and noise pollution are analyzed, charted and quantified.[90]

■ The duty to consider alternatives is subject to a rule of reasonableness. *Robinson v. Knebel*, 550 F.2d 422, 425 (8th Cir. 1977); *Natural Resources Defense Council v. Callaway*, 524 F.2d 79, 93 (2d Cir. 1975). The discussion of alternatives need not be exhaustive if the impact statement presents sufficient information for a reasonable choice of alternatives. *See Iowa Citizens For Environmental Quality, Inc. v. Volpe*, 487 F.2d 849, 852 (8th Cir. 1973); *Natural Resources Defense Council, Inc. v. Morton, supra*, 458 F.2d at 834. The extent to which the alternatives to a proposed project must be explored depends upon the complexity of the environmental problems raised by the project. *Iowa Citizens*, at 852. *Cf. Sierra Club v. Lynn*, 502 F.2d 43, 52 (5th Cir. 1974), *cert. denied*, 421 U.S. 994, 95 S.Ct. 2001, 44 L.Ed.2d 484 (1975). Applying the criteria set forth in the cases discussed herein, the Court finds that the alternatives were adequately considered in this record.

Plaintiffs also allege that the EIS did not use the proper criteria in evaluating the alternatives. They allege that the following criteria should have been considered: (1) increased transit ridership; (2) greater mobility for persons dependent on public transportation; and (3) promotion of desirable land usage. These criteria are drawn from UMTA's External Operating Manual, a handbook prepared by UMTA to provide general information concerning the agency and its work. Although it is obvious that such criteria were not mandated for the purpose of evaluating alternatives in the EIS, a review of the EIS indicates that they were considered.

■ Plaintiffs also argue that the EIS was deficient because it omitted a discussion of the "Null case". The "Null case" is the alternative proposal of making improvements to existing rail facilities without physically integrating the rail system. Renovating the Suburban Station and the Reading Terminal stations and purchasing additional commuter cars are the main features of this project. The Null case was considered in detail in the Simpson & Curtin Study,[91] and in the TSC Report.[92] The Simpson & Curtin Study found that the Null case required a capital investment dis-

**88.** *Id.* at 8.

**89.** *Id.* at 12a, 76a, 76b, 77.

**90.** Plaintiffs cite *Latham v. Volpe*, 350 F.Supp. 262, 266 (W.D.Wash.1972); *Brooks v. Volpe*, 350 F.Supp. 269, 277–280 (W.D.Wash.1972); and *Citizens Against Toxic Sprays v. Bergland*, 428 F.Supp. 908, 922 (D.C.Oregon 1977) in support of their contention that the EIS is inadequate. These cases all point out that an EIS must be sufficiently detailed so as to afford a reasoned analysis. We agree with this statement and find that the EIS in the case *sub judice* is sufficiently detailed.

**91.** App. III. It was also analyzed in Technical Supplement I to the Simpson & Curtin Study.

**92.** App. V.

proportionate to the benefits to be derived and that it failed to provide a regionwide transit framework for growth.[93] The Simpson & Curtin Study and the TSC Report are referred to in the EIS.[94] Supporting studies need not be physically attached to the EIS; they need only be available and accessible. *Trout Unlimited v. Morton,* 509 F.2d 1276, 1284 (9th Cir. 1974); *Life of the Land v. Brinegar,* 485 F.2d 460, 468–69 (9th Cir. 1973), *cert. denied,* 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); *Columbia Basin Land Protection Ass'n v. Kleppe,* 417 F.Supp. 46, 52 (E.D.Wash.1976).

Plaintiffs also assert that the EIS is defective in its consideration of air pollution. The Simpson & Curtin Study analyzed the air pollution impact of the Tunnel, concluding that there will be an overall favorable impact, with a net reduction in carbon monoxide and hydrocarbon emissions, but an increase in nitrogen oxide emissions.[95] The EIS also considered air pollution.[96] We find that the two studies contain a sufficient "good faith" exploration of the air pollution impacts of the Tunnel.[97]

Plaintiffs also attack the range of alternatives considered in the EIS. The EIS begins its analysis with a discussion of the broad objectives of urban transportation policy and the many social, environmental and transportation goals enveloped within those objectives.[98] It notes that a single project cannot accomplish all of the goals and that the EIS is not intended to be a comprehensive planning document for the development of transportation policy.[99] The EIS is intended to explore the environmental consequences the proposed action and the existence of any feasible alternatives that would obviate the adverse impacts of the project under consideration. An EIS need not exhaustively consider every possible alternative; it need only consider alternatives necessary for a reasoned discussion as noted in *Life of the Land v. Brinegar, supra,* 485 F.2d at 472:

> NEPA's "alternatives" discussion is subject to a construction of reasonableness. . . . [T]here is no need for an EIS to consider an alternative whose effect cannot be reasonably ascertained, and whose implementation is deemed remote and speculative. . . . Rather, the EIS need only set forth those alternatives "sufficient to permit a reasoned choice." . . . (citations omitted).

Although in NEPA cases material outside the administrative record should be examined in certain instances, *County of Suffolk v. Secretary of Interior,* 562 F.2d 1368, Civ. Nos. 77–6049, 77–6050 (2d Cir., filed August 25, 1977), Slip Op. at 5550–5552, we find that the administrative record in this case, particularly the EIS and the supporting studies, are sufficiently adequate for this Court to make its determination that there was no violation of NEPA or the CEQ guidelines and that there is no reason for this Court to consider new evidence. We have considered all of the plaintiffs' allegations as to the inadequacy of the EIS, the alleged violations of NEPA and the CEQ guidelines and we find that all of the procedural and substantive requirements of NEPA have been met.

**VIII.** *Alleged Civil Rights Violations— Fifth And Fourteenth Amendments To The Constitution, Title VI, § 1981*

Plaintiffs attack the Tunnel as being violative of the following constitutional and statutory civil rights provisions:

---

**93.** Simpson & Curtin Study, 14–15, 24. App. III; Technical Supplement I, 10–11; *See also* TSC Report, 10–15, 20–22, App. V.

**94.** EIS at 105a, 107, 107a, 112a; Response to Comments to Draft EIS, 18, 20, 21; App. IV.

**95.** Simpson & Curtin Study at 60–63, App. III.

**96.** EIS, 27–33, App. IV.

**97.** Plaintiffs point to a letter of February 27, 1976 from EPA's Regional Administrator to the Regional Administrator of the Federal Highway Administration stating the EPA's determination that the transportation plan for the Philadelphia-Trenton Urbanized Areas is inconsistent with air quality planning. The letter criticizes the 1985 transportation plan for placing too much emphasis on highway improvements to the detriment of transit programs. Nowhere in this letter is the Tunnel mentioned.

**98.** EIS at 20–71, App. IV.

**99.** *Id.* at 57–58, 72.

Fifth and Fourteenth Amendments to the Constitution; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; and the Civil Rights Act of 1871, 42 U.S.C. § 1981.

The Approval Memorandum of June 30, 1975 contains a certification by the director of the UMTA Office of Civil Rights.[100] It was made with the understanding that the UMTA Office of Civil Rights would conduct an on-site review at a later date.[101] That review was conducted by personnel from UMTA headquarters in Washington, D.C. and the Philadelphia Field Office on September 15–16, 1975. Termed a pre-award review, it points out that the June 30 certification was limited to a "desk audit review" due to the voluminous documentation relating to the project.[102] The review included meetings with representatives of the City of Philadelphia, the Public Interest Law Center, the Friends Neighborhood Guild representing the Poplar Community, and the Philadelphia Chinatown Development Corporation representing the Chinatown community.[103] The review team concluded that it was unable to discover a definite Title VI impact specifically related to the Tunnel [104] and made recommendations directed mainly at encouraging community participation in the development of the project and improving communications between the City and concerned community groups.[105]

The thrust of the plaintiffs' claims concerning civil rights violations appears to be set forth as follows in the complaint:

137. The Commuter rail system, of which the tunnel will be a part, serves approximately 10% of the daily transit riders now using transit in the City. Additionally, although over 90% of the City residents who use other forms of public transit have both ends of their trips in Philadelphia, more than two thirds of the users of the commuter rail system have at least one end of their trip in the suburbs, and are suburban residents The expenditure of federal funds for the CCCRC represents $10 per rider for the commuter rail system for every dollar proposed to be invested in local systems serving city users.

138. Because of historical patterns of official and de facto segregation and discrimination, more than 90% of the minority residents in the Metropolitan area live in the City, conversely, the CCCRC will serve predominantly affluent and white citizens.

### A. Fifth And Fourteenth Amendments

In recent decisions, the Supreme Court has delineated the elements required to establish a violation of the Fifth and Fourteenth Amendments in a complaint based on racial discrimination. In *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) and *Village of Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), the Supreme Court held that in suits alleging racial discrimination disparate impact is not enough to make out a constitutional violation. In *Arlington Heights,* the Court stated:

Our decision last term in *Washington v. Davis,* [citation omitted], made it clear that official action will not be held unconstitutional solely because it results in a racially disproportionate impact. . . . Proof of racially discriminatory intent or

---

100. Approval Memorandum, Project Findings and Determinations, App. X.

101. Title VI, Pre-Award Review at 1, App. XI.

102. *Id.*

103. The on-site review was conducted to:
   (1) Learn the concerns of the various community groups impacted by the project;
   (2) Conduct a visual survey of the impacted communities and project area to supplement the Title VI desk audit;
   (3) Determine the validity of community complaints and allegations; and
   (4) Where appropriate, to recommend corrective action. *Id.*

104. *Id.* at 12.

105. *Id.* at 13–15.

purpose is required to show a violation of the Equal Protection Clause.

429 U.S. at 264, 97 S.Ct. at 563.

The plaintiffs have not alleged discriminatory intent, and there is nothing in this administrative record evidencing an intent to discriminate under the Fifth or Fourteenth Amendments. We, therefore, find that the Secretary's approval of the Tunnel does not violate these Amendments.

### B. Title VI and § 1981

■ Title VI [106] (42 U.S.C. § 2000d) provides:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.[107]

Defendants contend that plaintiffs lack standing to assert a Title VI claim, relying on *Evans v. Lynn,* 537 F.2d 571 (2d Cir. 1976), *cert. denied,* 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1977). In *Evans,*[108] the plaintiffs were members of a minority group which sought to challenge grants made by HUD to a neighboring community for sewer improvements and for the acquisition of land to be used as a wildlife preserve. They alleged, by way of background, that the recipient community had pursued exclusionary zoning laws to discourage minority housing. The contention was that in making the grant under such circumstances, HUD had failed to affirmatively promote fair and suitable housing for minority persons, that the grant fostered the discrimination practiced by the recipient against minority citizens, and that the plaintiffs were being denied the right to participate in the receipt of the federal benefits, all in violation of Title VI. *Id.* at 580–81, 590. There was no allegation that the projects themselves discriminated against minority persons, *i. e.,* that the sewer improvements and the wildlife preserve would not be available to minority persons on a non-discriminatory basis. The court held that under such circumstances the plaintiffs were not injured by the grant and had no standing to challenge the action of HUD in funding the projects. Writing for the majority of the court en banc, Judge Moore stated:

[A]ppellants have failed to allege *any facts whatsoever* indicative of injury suffered by them as a result of the grants to the District and the Town. They do not claim . . . that they unsuccessfully sought housing in the Town, or that the Town arbitrarily rejected housing proposals of benefit to them. They claim only that, had the grants not been approved, the monies *could conceivably* have gone to some other, as yet *totally imaginary* project in the County which *might* have had the result of making more housing available to them. This goes beyond even the realms of "remote possibility" which were rejected in . . . [*Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)]. It amounts to pure speculation and conjecture and, needless to say, it is completely inadequate to demonstrate the requisite injury under Article III.

537 F.2d at 595 (emphasis in original). Judge Mansfield, in his concurring opinion, stated:

There is not the slightest indication in the present record that the plaintiffs will be adversely affected by the federal funding of the New Castle sewer and recreation

---

**106.** *See* regulations promulgated by DOT to effectuate the provisions of Title VI, 49 C.F.R. § 21.1 *et seq.*

**107.** 42 U.S.C. § 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all

laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**108.** The district court dismissed the complaint, which decision was reversed on appeal by a three-judge panel. On rehearing, the court en banc affirmed the district court.

projects or that if the funding were enjoined as demanded the plaintiffs would be benefitted. What they seek is a ban on federal funding to New Castle because it is allegedly a predominantly white, wealthy, exclusionary community, not because they would thereby gain anything. . . . In *Hills v. Gautreaux,* 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976), for instance, the plaintiffs, who were tenants in federally funded, racially segregated housing in predominantly black ghetto areas in Chicago, stood to benefit from the relief sought, an order which would eliminate the discrimination against them by directing that such housing, for which they had applied as tenants, must be constructed in predominantly white areas where the plaintiffs might then reside . . . .. Here plaintiffs gain no comparable benefit from the injunction sought. The most they can realize is the satisfaction that federal funds will not be misused. Absent statutory authorization, this is not enough to confer standing. They must show *some* stake in the outcome.

537 F.2d at 598 (emphasis in original).

The contention advanced by plaintiffs in the instant case is very similar to that alleged in *Evans.* Plaintiffs do not contend that the Tunnel will not be available on a non-discriminatory basis to all citizens of the area or that minority persons will be denied access to the Tunnel, but contend that minority residents would achieve greater benefit were the Federal funds diverted to some other program. The plaintiffs suggest that if the funds allocated for the Tunnel were used for transportation projects within the City, greater benefits would be realized by the minorities in Philadelphia. At oral argument it was stated that in the event the Tunnel project is abandoned there is no assurance and little probability that the funds committed by the Federal government for the Tunnel would be made available for any other project within the City of Philadelphia.

Consistent with the statutory objectives, the Tunnel is anticipated to provide multiple transportation, environmental and developmental benefits to the entire area, and cannot be fairly characterized as differentially benefiting, in its overall scope, any particular segment of the population. To the extent that the project results in a significant reduction in automobile traffic and a consequential reduction in traffic congestion and improved air quality, all residents of the area benefit. To the extent that the Tunnel improves mass transportation, it should benefit everyone in the Delaware Valley area. We find, therefore, that the Secretary's decision does not violate Title VI or § 1981.

## IX. *Clean Air Act*

Plaintiffs allege that the Secretary's approval of the Tunnel violates the Clean Air Act of 1970 as amended, 42 U.S.C. § 1857 *et seq.,* which was enacted "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare . . . ." 42 U.S.C. § 1857(b)(1). Plaintiffs allege that the Clean Air Act, when read in conjunction with NEPA, imposes a burden on Federal agencies to rigorously analyze air quality impacts of reasonable alternatives to the project.

The Clean Air Act is lengthy and complicated. The Administrator of the Environmental Protection Agency (EPA) has exclusive responsibility for establishing national ambient air quality standards, while the states have primary authority, subject to EPA review, for establishing implementation plans to achieve these standards. The Act contains its own provisions for citizens' suits and judicial review.[109] It also

109. Sections 1857h–2(a) and (b) provide:
(a) . . . any person may commence a civil action on his own behalf—
(1) against any person . . . who is alleged to be in violation of (A) an emission standard or limitation under this chapter or

(B) an order issued by the Administrator or a State with respect to such a standard or limitation,

(b) No action may be commenced—

contains notice requirements relating to the Court's jurisdiction.[110]

■ In authorizing Clean Air Act litigation, Congress restricted citizens' suits to actions seeking to enforce specific requirements of the Act or clear-cut violations. *See* Legislative History cited in *Natural Resources Defense Council, Inc. v. Train,* 166 U.S.App.D.C. 312, 320, 510 F.2d 692, 700, n. 39 (1975). The language of the review provisions cited also suggests that citizens' suits can not be brought in advance of any violation of a substantive provision of the Act. We have not found any violation of the Clean Air Act and the plaintiffs have not called to our attention any violation of the Act other than the "protect and enhance" language found in the introductory section. Plaintiffs allege that the failure of the EIS to consider air quality benefits of alternatives to the Tunnel renders the EIS deficient. Plaintiffs rely on *Sierra Club v. Ruckelshaus,* 344 F.Supp. 253 (D.D.C.1972), *aff'd* (per curiam), 4 ERC 1815 (D.C.Cir. 1972), *aff'd by an equally divided Court, Fri v. Sierra Club,* 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973). In that case, plaintiffs sought to enjoin the Administrator of the EPA from approving certain portions of state air pollution control plans which had been submitted to him. Pursuant to 42 U.S.C. § 1857c–5, the Administra-

tor must approve or disapprove each such plan submitted. The Court considered the "protect and enhance" language to determine legislative intent in connection with the standards to be used by the Administrator in approving State plans. The claim of the plaintiffs in *Sierra* was not predicated on the "protect and enhance" language. Assuming, however, that the "protect and enhance" language may serve as a basis for a claim that the Secretary violated the Act, we find that the Secretary's decision does not in any manner violate the Clean Air Act.

## X. *Federal Water Pollution Control Act*

■ Plaintiffs' claims pursuant to the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.,* are that the defendants have violated the Act by their failure to obtain a National Pollutant Discharge Elimination System (NPDES) Permit as required by 33 U.S.C. § 1342.[111] Defendants allege, and plaintiffs have not pointed out any authority to the contrary, that there is no requirement that an NPDES Permit be obtained in advance of actual construction. There is no allegation that the defendants have failed or refused to comply with the terms and conditions of any permit so required, nor that the EPA has refused or

---

(1) under subsection (a)(1) of this section—

(A) prior to 60 days after the plaintiff has given notice of the violation (i) to the Administrator, (ii) to the State in which the violation occurs, and (iii) to any alleged violator of the standard, limitation, or order . . . .

**110.** Plaintiffs admit in their memorandum that they have not met the sixty-day notice requirement. Therefore, this Court has no jurisdiction under this section. *West Penn Power Company v. Train,* 522 F.2d 302, 307, n. 20 (3d Cir. 1975), *cert. denied,* 426 U.S. 947, 96 S.Ct. 3165, 49 L.Ed.2d 1183 (1976). *But see Natural Resources Defense Council v. Callaway,* 524 F.2d 79, 83–84 (2d Cir. 1975); *Natural Resources Defense Council v. Train,* 510 F.2d 692, 698–703 (D.C.Cir. 1975), in which the notice provisions of the Clean Air Act and Federal Water Pollution Control Act, which are substantially similar, were held not to be jurisdictional prerequisites to citizens' suits. Plaintiffs also claim that Section 1857h–2(e) permits suits pursuant to the Clean Air Act to be brought

under other statutes, and that they have properly alleged jurisdiction under 28 U.S.C. § 1331. Section 1857h–2(e) provides:

(e) Nothing in this section shall restrict any right which any person . . . may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief (including relief against the Administrator or a State agency).

This view is held by the most recent courts that have considered this issue. *Citizens Ass'n of Georgetown v. Washington,* 383 F.Supp. 136, 139 (D.D.C.1974); *City of Highland Park v. Train,* 374 F.Supp. 758, 768–69 (N.D.Ill.1974). Other cases have held that actions coming under the subject matter of the Clean Air Act could not be brought under other jurisdictional statutes. *Pinkney v. Ohio EPA,* 375 F.Supp. 305, 308–309 (N.D.Ohio 1974); *Riverside v. Ruckelshaus,* 4 EPC 1728, 1730 (C.D.Cal.1972).

**111.** See nn. 109 and 110 for a discussion of jurisdiction under this statute.

indicated an intention not to issue any required permit. Consequently, we hold that the Secretary's decision does not violate the Federal Water Pollution Control Act.

## XI. *Pendent Claims*

Having determined that the defendants are entitled to summary judgment on the Federal claims, we must ascertain whether a state cause of action should be entertained under the doctrine of pendent jurisdiction in the absence of an independent basis for Federal jurisdiction. The standard by which we are guided is set forth by the Supreme Court in *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Under the doctrine of pendent jurisdiction, Federal courts have power to adjudicate claims based upon state law wherever there is a substantial Federal claim "and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.'" *United Mine Workers v. Gibbs*, 383 U.S. at 725, 86 S.Ct. at 1138. *Cf. Moor v. County of Alameda*, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973). As stated in *Gibbs*,

> . . . pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them, *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. *Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.* [emphasis supplied] [footnotes deleted].

383 U.S. at 726; 86 S.Ct. at 1139.

Plaintiffs' pendent state law claims arise under the Pennsylvania Department of Transportation Act of 1970, 71 P.S. § 511 *et seq.*, the Philadelphia Home Rule Charter, 351 Pa.Code § 1.1–100 *et seq.*, and 53 P.S. § 17031. Application of the *Gibbs* standard leads us to exercise our discretion by dismissing the pendent claims.

## XII. *Conclusion*

The Court considered each and every allegation of the plaintiffs set forth in their 61 page complaint and finds that the decision of the Secretary of Transportation providing a $240,000,000 grant of Federal funds to the City of Philadelphia for the construction of the Tunnel does not violate any statutory or Constitutional provisions. On the basis of our searching and careful review of the administrative record, we find that the Secretary's decision was not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. Accordingly, we shall deny plaintiffs' motion for summary judgment and grant defendants' motion for summary judgment.